P. F. NATALE, appellant, v. SISTERS OF MERCY of Council Bluffs (operating Mercy Hospital in Des Moines) et al., appellees.

No. 47959.

(Reported in 52 N.W.2d 701)

April 1, 1952.

Strickler & Strickler, of Des Moines, for appellant.

Parrish, Guthrie, Colflesh & O'Brien, of Des Moines, for appellees.

BLISS, J.—From a record which is confusing in some respects we reach the conclusions noted herein as to the facts, some of which are not disputed. The Order of The Sisters of Mercy of Council Bluffs, Iowa, was organized and reincorporated for a period of fifty years, on May 21, 1938, as a nonpecuniary corporation under chapter 394 of the 1935 Code of Iowa (chapter 504, Code, 1950). It is a private corporation and as such operates hospitals, schools and other institutions, one of them being Mercy Hospital in Des Moines. Mercy Hospital appears in the title as a defendant. No pleading alleges what kind of entity it is, if it is an entity. Neither the testimony nor the exhibits makes the matter certain. The body having the immediate management and control of this hospital is known as the governing board or as the executive board of the hospital, consisting of three Sisters—a Sister Superior and her first and second assistants. While the hospital is privately operated, it is open to the public and it serves all persons without regard to race or creed, although the governing board exercises the right to deny its services to any patient or doctor.

During the period involved, three other hospitals were in operation in Des Moines, the Iowa Methodist, the Iowa Lutheran and the Broadlawns Polk County Hospital. The last named is a public corporation, operated by governmental or municipal authority and supported by the taxpayers. The Methodist and the Lutheran Hospitals are private corporations of the same type as Mercy Hospital and all are operated largely in like manner. There is what is known as a Des Moines Hospital Council which attempts to standardize the regulations and operations of the hospitals. The charges for like services in all of them are substantially the same. There was evidence of a charge of $16 a day for a room in Mercy Hospital. The charity cases are apparent-

ly cared for at Broadlawns Hospital. We base our conclusion upon the following testimony of Sister Mary Anita, a witness for defendants, no longer connected with the hospital, who entered it in June 1932 and was superintendent from August 15, 1941 to August 15, 1947. She was asked on cross-examination: "Q. You give and administer service to the public at large, do you not? I mean that anyone that wants to come to your hospital if you have a room vacant you will take care of them, is that right? A. Not necessarily, if they were a patient that should be at Broadlawns we would not have to. * * * Q. If there is a sick man, and his doctor calls your hospital, you give him accommodations, don't you, if you have it? A. If we have it and that is the place he belongs. * * * If it is an emergency case we give the patient emergency care, but if it turns out to be a case that should be at Broadlawns or a county case, we would not be forced to keep him."

The requirements for the admission of doctors to the medical staff of any of these hospitals were the same or substantially so. During the period pertinent to the matters involved herein there were between forty and fifty doctors on the medical staff of Mercy Hospital. The staff consisted of two classes, associate and active. In the class first-named are the younger and newer members, who, after three years, become eligible to be active members and to be holders of offices on the staff, which were president, vice president and secretary-treasurer. These officers constituted an executive committee to act as a board of directors to confer and advise, in matters pertaining to the welfare of the hospital, with the Sister-governing-body, which is always present at the meetings of the executive committee or staff.

Members of the medical staff of Mercy Hospital and of the other hospitals named above are required to be members in good standing of the corporate body known as the Des Moines Academy of Medicine and Polk County Medical Society, competent doctors of good character who conduct themselves in accord with professional and ethical standards, are well recommended and are endorsed by two members of the Polk County Medical Board, or of the staff.

The plaintiff, Pasquale F. Natale, was born in Naples, Italy, on the 9th of January, 1904, and came to the United States with

his parents when he was about two years old. The family settled at Youngstown, Ohio. They had little means and the parents sacrificed much to educate Pasquale. Upon graduation from high school he attended the University of West Virginia for a year and a half, the Ohio State University for three years and a half, and completed four years at Loyola University School of Medicine in Chicago. He received the degrees of Bachelor of Arts and Bachelor of Science. On graduation from Loyola he received a certificate that he "has successfully completed four years of medical studies at this institution on June 8, 1932, and will receive the Doctor of Medicine on June 2, 1933, upon the satisfactory completion of the fifth or intern year." The certificate has the signature of the Dean of the Medical School and the seal of the University.

Plaintiff took his year of internship at Mercy Hospital in Des Moines, and on its completion he received from it a certificate signed by all of its officers and by the Sister who was the superintendent, with the seal of the hospital affixed, dated July 1, 1933, which stated: "This is to certify that Pasquale Natale having served as intern for one year as required by the regulations of this institution and discharged his duties to the entire satisfaction of the medical staff and officers is hereby granted this certificate." Before he completed his internship, and on December 2, 1932, he made application before H. W. Grefe, director of examinations, for a physician's license, and presented to him his certificate of graduation from Loyola University School of Medicine, which was accepted as the equivalent of a diploma from the school, and Mr. Grefe made the entry on the application that plaintiff had a diploma. The date of the examination does not appear in the record, but it is shown that it was before the completion of his internship, and that the certificate of Mercy Hospital of said completion was verified and returned by Mr. Grefe to plaintiff on July 1, 1933, and on July 2, 1933, a license to practice medicine was issued by the State Department of Health to the plaintiff. It was thereafter kept in force and the last renewal thereof, as shown by the record, was for the year ending June 30, 1951.

In resistance to plaintiff's petition, and in support of their withdrawal from plaintiff of the facilities of Mercy Hospital, de-

fendants, by answer, alleged three defenses, namely: First, the hospital was a privately operated institution and that a court of equity could not interfere with its internal affairs; second, that plaintiff was not a member of the aforesaid Polk County Medical Society, and therefore not entitled to be on the medical staff of Mercy Hospital; and third, that publicity unfavorable to plaintiff arising from the trial of his divorce suit made his membership on the medical staff of the hospital injurious to the defendants.

It was the contention of plaintiff that the hospital was a public institution receiving governmental financial aid in the sum of $132,000, and some immunity from taxation, and that he and his patients were entitled to the facilities of the hospital as a matter of right.

It is our conclusion, and it is virtually conceded by defendants, that the impelling reason for the action which they took against plaintiff was the unfavorable newspaper and radio notoriety connected with the divorce proceedings.

After obtaining his license to practice his profession in July 1933 the plaintiff opened an office in Des Moines. He was a member of the Polk County Medical Society for four years— 1935 through 1938. In or about 1938 he opened an office in Ankeny and lived there, although also maintaining his Des Moines office. He paid no dues to the Polk County Medical Society for the year 1938 and was dropped from its membership roll for that reason, and has not been a member since. About January 1, 1947, he applied for admission to the society. Receiving no response, plaintiff had Mr. Bellizzi write the secretary on March 21, 1947. Mr. Bellizzi received no reply. Defendants, by Mr. Kingery, Executive Secretary of the Society, read into the record a purported carbon copy of a letter with the name Harold C. Bone affixed to it, and addressed to plaintiff at 406 Southern Surety Building, Des Moines, bearing date of March 19, 1947, stating: "According to the rules and regulations of the Polk County Medical Society, as interpreted by the council, you do not meet the requirements for membership in this society." No other reasons were stated. Asked "Who mailed it?" and "Did you see it mailed?" Mr. Kingery replied to each question "I would not answer that." He said he did not remember whether

he mailed the letter. There was no testimony about postage. Plaintiff testified he never received the letter. On February 4, 1935, he made written application to Mercy Hospital for his appointment to the medical staff of the hospital. At that time he was a member of the Polk County Medical Society. He was a member of the medical staff of the hospital for ten years—from 1935 to March 6, 1945— notwithstanding he was not a member of the Polk County Medical Society after 1938. Sister Mary Anita testified that when a member of the hospital medical staff ceased to be a member of the Polk County Medical Society that fact "automatically" dropped him from the hospital medical staff, without any action on the part of the hospital. The governing board of the hospital and the executive committee of its medical staff knew that plaintiff was not a member of the Polk County Medical Society during those seven years. The same witness testified that the Polk County Medical Society periodically sent a list of its members in good standing to Mercy Hospital. Plaintiff and his patients received the full use of the facilities of the hospital during those seven years the same as every staff member. No one connected with the hospital ever notified him or told him anything to the contrary, and he testified that he did not know that membership in the Polk County Medical Society was a requisite to a practitioner in the hospital, or for membership of its medical staff.

We will digress to the divorce issue. While he was an intern at Mercy Hospital he became acquainted with the Felix Colavecchio family. He had been keeping company with a girl. Mary Colavecchio was engaged to a young man at that time, whose departure from Des Moines terminated the engagement. The members of the Colavecchio family were very kind to plaintiff and he many times enjoyed the hospitality of their home. The daughter, Mary, had been employed as a secretary or stenographer in an office in the Des Moines Police Department since 1930. This employment continued until in 1943. She and plaintiff began going together. The 1148-page transcript of the testimony in the subsequent suit, in which each asked for a divorce, was introduced in evidence by defendants in the case at bar, and has been certified to this court. It appears therefrom that the courtship between plaintiff and Mary extended over five or more

years, and was interspersed with a great many quarrels. They entertained grave doubts of a happy marriage. She was very jealous of him during the courtship and the later marital relation, and throughout each the subject of their continued quarreling was her expressed suspicions and accusations of his improper intimacies with his female patients. She discussed these matters with others. They made two or three automobile trips to his parents' home in Ohio. He testified to their sexual intercourse during courtship. On the Ohio trip of August 1938 marriage was again discussed, and he testified that he told her that there could be no happy marriage between a doctor and a suspicious, jealous wife. Both were Catholics. He testified that he finally consented to a trial marriage of six months on condition that it would then be terminated if she persisted with her accusations. It was agreed that they would not be married according to the rites and regulations of their church, but would be married by a Justice of the Peace. Certain restrictions prevented their marriage in Ohio, and they went to Mercer, Pennsylvania, and were married on August 11, 1938, by a Justice of the Peace. If the marriage was a success they were to have a church marriage later. If there was such a marriage the record in neither case disclosed it.

On their return to Des Moines plaintiff wished to drive on to his quarters at Ankeny, but his wife urged that her folks be told of the marriage. This was done and there was a quarrel as the plaintiff anticipated. There had been some discussion in the parental home at a prior time about a dowry. The father was very angry about the circumstances of the marriage and told the couple they would never get a cent from him. The relations between the two families were not pleasant for a long period.

Plaintiff and his wife acquired a comfortable home in Ankeny which they remodeled and enlarged so as to afford the plaintiff an adequate office. The wife continued her work in the police department. Her hours there were from 8 a.m. to 5 p.m. On certain days of the week plaintiff was at his Des Moines office in the forenoon, but at other times he was at his office in the Ankeny home. It was necessary to have outside help for the home. Plaintiff's brother and wife were there for a time. Plaintiff's mother, who required some surgical or hospital care, and his father, were

there and performed household duties for some months. The parents needed help. Witnesses testified that plaintiff's wife persistently questioned the help about the house and the neighbors with respect to the women who called at plaintiff's office and for a description of them. In 1941 a man from Missouri came to work in the defense plant at Ankeny. His wife and boy, about ten years old, came with him. They lived in the Natale home. The wife did the housework and took care of the doctor's office and received patients who called in his absence. The boy went to school at Ankeny. They remained in the home until 1943. Every day Mrs. Natale quizzed her about the lady callers. The housekeeper resented it. She saw nothing improper in the conduct of the doctor or any of his patients and so told Mrs. Natale, who expressed her doubt of the truth of what the housekeeper said. Natales had a cat and a dog that played about the house. Sometimes they would get on the beds. One day, Mrs. Natale came downstairs after returning from work. She told the housekeeper that she found the spread on one of the beds disarranged, and asked if the doctor had had a woman upstairs.

This housekeeper was asked: "What were the circumstances of your leaving in January 1943? A. Well my husband and I talked it over. It just got too much for me, the work was too much. And I didn't like always being asked who was in the office, because I didn't figure it was any of my business who was in there. Every time she would come home she would make the remark: 'Who was there?' It made me so nervous. I was almost a nervous wreck when I left there."

The divorce trial was had on plaintiff's petition and his wife's cross-petition. It began on January 15, 1945, and continued for two weeks or more. All testimony was received without ruling on objections and much testimony was put in on each side that was outside the issues. With the exception of one witness the doctor and his wife were the only witnesses who testified to adulterous conduct of the other. This was done by testifying to admissions of the other. The doctor testified that his wife admitted to him that she had sexual intercourse with a half dozen or more Des Moines men. He named them in his testimony. His wife denied both the acts and the admissions. The men who were called as witnesses by defendants denied the acts with the

exception of one man, who testified to sexual intercourse with Mrs. Natale at a drinking party in her home when her husband was absent. Mrs. Natale testified that her husband had admitted his sexual intimacy with two women, naming them. The doctor in his testimony admitted these intimacies and the admission to his wife, but said that they took place before his marriage. He denied any adulterous acts during his marriage, and there was no evidence of any.

The extent of the publicity of testimony at the divorce trial does not appear, except witnesses testified that during the trial comments on the testimony appeared in daily news articles under lurid headlines, and also in radio broadcasts.

A decree granting Mrs. Natale a divorce was rendered February 5, 1945.

The next day, February 6, the executive committee of the medical staff met with the Sister-governing-board, and a motion was made "that a recommendation to the governing board be made that Dr. P. F. Natale be dropped as a member of Mercy Hospital staff and that he not be allowed to bring patients to Mercy Hospital." The motion was carried without a dissenting vote of the members of the executive staff or of the governing board.

No other recorded action was taken by the Sister-governing-board. The by-laws of the medical staff provide as follows:

"Sec. XIII. Unprofessional or unethical conduct, or the violation of the Constitution, by-laws, or rules of this staff, shall constitute a cause for expulsion. Any member against whom any of the foregoing charges have been preferred, shall be notified of such charge or charges, and shall have the opportunity of appearing before the executive committee, in his own defense, before final action shall be taken as provided in section XIV.

"Sec. XIV. Any member may have the privilege of membership on this staff withdrawn, either by the Sister-governing-body or by the staff. If such action is initiated by the staff, a two-thirds vote of the members present and voting shall be necessary for the withdrawal of such privilege."

There is no evidence that any charge was preferred against the plaintiff. He was not notified of any charge. He was not

present before the executive committee. He had no opportunity of appearing in his own defense before the committee, before final action was taken, or at any time. There were no witnesses before the committee or at the meeting. There was in fact no hearing. The knowledge of the committee was based only on rumors they had heard. Plaintiff was not notified of his expulsion by the executive staff or by the governing board. He first learned of it on March 6, 1945. He was then informed by Ralph J. Bellizzi, a lawyer friend, whose family he had cared for professionally, who had been told by Mrs. Natale of the expulsion. At plaintiff's suggestion, Mr. Bellizzi, as a friend, went with him to see Sister Mary Anita to find out why plaintiff had been dismissed from the staff. The Sister told them it was because of the scandalous divorce case, and that within a few months things would quiet down and plaintiff would be back on the staff, but that in the meantime she would prefer that he not see his patients. This testimony of plaintiff and of Mr. Bellizzi was confirmed by the Sister.

The recommendation of the executive staff or committee *that plaintiff be not permitted to bring patients to the hospital* was never enforced by the governing board of Sisters, which made the final decisions in all matters in the management and operation of the hospital. In the conversation with Mr. Bellizzi and plaintiff, Sister Mary Anita testified that she said: "I gave him the decision of the executive staff that he would not bring his patients to the hospital, but that he could come in as a visitor with his patients, but to get some other doctor to care for them if they were in the hospital."

Plaintiff testified that he brought into the hospital after his dismissal from the staff about forty patients each year, and that in the three years preceding the trial he had brought in forty-one obstetrical and surgical cases, which the hospital refused him permission to attend, and he paid other surgeons to attend them out of fees he received from the patients. He testified:

"At first I was permitted to scrub, to assist in the operation, with the surgeons that did my surgery, and then one morning the Sister came to me in the operating room and told me I could not assist so I went to see Sister Mary Anita and she advised me

I could not assist in the operation and I never did after that. At that time I was permitted to see the charts of my patients to note their progress, but that was discontinued about September 1, 1948. Sister Mary Anita said I couldn't deliver the babies and take care of my patients in the hospital, and some other doctor on the staff would have to do it, and since Dr. Harold Anderson was already doing some of my work I continued to use him in all my cases, obstetrical and medical as well as surgery. The only reason I used him was because the hospital refused me their services."

He estimated that in the six years ending in March 1951 he had suffered damages in the sum of $95,000 because of the acts of the hospital. Plaintiff has married since his divorce and his three children were delivered in Mercy Hospital.

The plaintiff had been the doctor for Mr. Bellizzi and his family. Mr. Bellizzi testified that the doctor had always given them excellent service and he had much confidence in him. When his wife was about to be confined in January 1947 she asked that she have Dr. Natale attend her. Mr. Bellizzi had rendered the hospital much service in securing from War Public Works a grant of $132,000 to the hospital to build a nurses' home. He told Sister Mary Anita of his wife's request, and after some consultation with others the Sister granted the request. The plaintiff attended Mrs. Bellizzi. A night or two later he was called by Sister Zeta, who had charge of the obstetrical department, to attend another of his patients in childbirth. He told her he was not permitted to do so. She said "don't be silly", and he delivered the baby. He was never permitted to deliver any babies after that.

I. The trial court in its conclusions of law expressed as its opinion and conclusion that: "1. Mercy Hospital in Des Moines, Iowa, is a charitable institution; that it is a private corporation engaged in public charity." We find that none of these conclusions is established by the record, and that the hospital is not a private corporation or a charitable institution engaged in public charity, in so far as the record discloses. In its second opinion and conclusions of law the trial court also speaks of the "corporate internal affairs" of Mercy Hospital.

As we read the record, Mercy Hospital is not a self-existing or self-operating entity, but it is merely a function, enterprise or business conducted by the Sisters of Mercy, not different in a legal aspect from a farm or grocery store which it might operate. The record establishes that the Order of The Sisters of Mercy of Council Bluffs is a private corporation and it is the only one involved in this action. Whether it conducts some of its enterprises as charitable institutions is a matter with which we are not concerned. This litigation involves the operation of Mercy Hospital only.

We have mentioned the medical staff of the hospital and the executive committee of the staff which acts as its board of directors to confer and advise with the "Sister-governing-body" in hospital matters. It is not clear whether the staff is a corporation. Introduced in evidence were five typewritten sheets of paper, uncertified, and designated as the "Constitution, By-laws and Rules of the Medical Staff of Mercy Hospital." Section II of the constitution states that the chief aims of the organization are "to secure and maintain high standards of ethical principles, and the practice of medical and surgical efficiency, and thus promote to the maximum of the patients and nurses coming under its influence, and to aid in the scientific advancement of its members." The organization is not a defendant in this action. Its function appears to be largely, if not wholly, advisory to the three Sisters governing board of the hospital. Sister Mary Anita testified that the governing board withdrew the hospital privileges from plaintiff, and that the executive committee of the staff only recommended this action. The Sister also testified: "Q. Following your answers to my questions on this question of the right to practice in your hospital to its logical conclusion, do you feel that you have the right to go back and exclude any member from practice in your hospital that you Sisters governing body see fit? A. Yes. Q. Which means you could exclude half or all of the physicians in Des Moines if you saw fit, is that correct? A. Yes."

■■ Each party stresses the contention that Mercy Hospital is engaged in public charity. If this was a fact it would be immaterial and irrelevant. The decisive factor in this action is the fact that the Sisters of Mercy is a private corporation and

has operated Mercy Hospital as a private business. The fact that its services and facilities are available to the public does not make it a public corporation, whether for pay or as charity. Being a private corporation the Sisters of Mercy had the right to make rules and regulations respecting patients, and physicians, and to conduct the hospital as they saw fit, so long as its acts or omissions were not fraudulent, illegal, ultra vires or intentionally, negligently or otherwise wrongfully injurious to another—in which event it would be liable as any other private corporation, so offending.

One requisite to membership on the hospital medical staff was that a physician be a member in good standing of the Polk County Medical Society. Plaintiff was not a member of this society on February 5, 1945, when the staff made its recommendation, or on March 6, 1945, when the governing board notified him of his dismissal, and had not been a member for over seven years. The fact that he had been permitted to practice as a member of the staff, or to be a member of it, would not estop the corporation from dismissing him. His permission to attend his patients in the hospital and use its facilities in his practice was but a privilege and not a right vested in him by contract, or other obligation of the Sisters of Mercy.

Neither does the fact that no charge was preferred against him by the executive committee of the staff, or by anyone else, and that no hearing was had before the committee, or opportunity given him to make a defense, avail him in this action. Sections XIII and XIV, supra, were by-laws of the staff and not binding on the governing board. The fact that plaintiff was not a member of the Polk County Medical Society was sufficient in itself to effect his dismissal from the staff, so that if he had been afforded full opportunity to make a defense it would have been of no aid to him.

Another requirement for membership of the staff was good character and conduct in accord with generally accepted moral standards. It was for the Sisters of Mercy, as a private corporation, through the governing board of Mercy Hospital, to exercise its discretion and to decide whether, because of the evidence in the divorce trial and its extensive publicity, the plaintiff then qualified under the requirement last-mentioned.

The failure of the plaintiff to meet either of the requirements, noted just above, for eligibility to the medical staff of Mercy Hospital, sustains the decree of the district court.

■ II. The Sisters of Mercy, of Council Bluffs, Iowa, is a private corporation, as clearly appears from its Articles of Incorporation. It is not a public corporation nor an instrumentality of the state or any municipal or political arm or department thereof, and is not supported by public funds or operated by public employees. It is a fundamental and generally accepted rule that courts will not interfere with the internal management of a private corporation. It is stated in 2 Fletcher Cyc. Corporations, section 505, page 390:

"It is a well-known rule of law that questions of policy of management are left solely to the honest decision of officers and directors of a corporation, and the court is without authority to substitute its judgment for the judgment of the board of directors; the board is the business manager of the corporation, and so long as it acts in good faith its orders are not reviewable by the courts."

The same rule, of course, applies to private corporations operating hospitals. As said in 26 Am. Jur., Hospitals and Asylums, section 7: "In so far as a hospital occupies the status of and functions as a private corporation, matters pertaining to the management and operation thereof are governed by the rules which are applied to the case of private corporations generally, except as modified by statute."

■■ III. In accord with the above stated rule the power to manage and control a hospital operated by a private corporation includes the authority and power to select and to exclude physicians from the privilege of practicing their profession in the hospital. The rule is stated in 26 Am. Jur., Hospitals and Asylums, section 9, thus: "It seems to be the practically unanimous opinion that private hospitals have the right to exclude licensed physicians from the use of the hospital, and that such exclusion rests within the sound discretion of the managing authorities." For a like statement of the rule see note of the annotator in 60 A. L. R. 656, 657, reporting Henderson v. City of Knoxville, 157 Tenn. 477, 9 S. W.2d 697, 698, 60 A. L. R. 652

(public corporation). Other leading cases with like holdings are: Van Campen v. Olean General Hospital, 210 App. Div. 204, 205 N. Y. S. 554; Levin v. Sinai Hospital, 186 Md. 174, 180, 46 A.2d 298, 301, in which the court said:

"A private hospital is not under a common-law duty to service everyone who applies for treatment or permission to serve. * * * Likewise, the directors of a private hospital corporation, having power to appoint members of its medical staff, have the authority to remove them from the staff. It has never been the policy of the State of Maryland to interfere with the power of the governing body of a private hospital to select its own medical staff."

Other authorities are State ex rel. Wolf v. La Crosse Lutheran Hospital Assn., 181 Wis. 33, 193 N.W. 994; People ex rel. Replogle v. Burnham Hospital, 71 Ill. App. 246; Hughes v. Good Samaritan Hospital, 289 Ky. 123, 158 S.W.2d 159; Strauss v. Marlboro County General Hospital, 185 S. C. 425, 194 S.E. 65 (public hospital); Harris v. Thomas, Tex. Civ. App., 217 S.W. 1068. As said in Van Campen v. Olean General Hospital, supra, at page 209 of 210 App. Div., page 558 of 205 N. Y. S., "There can be no absolute right in individuals [patient or physician] to claim the benefit of its privileges." In the same opinion it is stated:

"The fact that they [corporate private hospitals] may receive a donation from the government to enable them to carry on their work, or funds from a city or county to care for sick and disabled indigent persons * * * does not affect their character as private institutions. * * * Defendant is a nonstock corporation * * * and is granted exemption from taxation * * * [and] these facts do not indicate that the corporation is public. Exemption from taxation is given by the Legislature to many corporations and individuals as a matter of public policy." (At page 207 of 210 App. Div., page 556 of 205 N. Y. S.)

The words of the court in Hughes v. Good Samaritan Hospital, supra (289 Ky. 129, 158 S.W.2d 162), are apropos in this case, to wit:

"We have before us merely one question—his vested right to operate in the rooms of appellee hospital; when it for no manifested arbitrary or capricious reason, but in the exercise of a reasonable discretion to maintain its institution on an accredited basis, decided otherwise. Appellant has failed to demonstrate that he has such vested right, either by contract, inherently or as vouchsafed by any constitutional provision, hence we are of the opinion that the chancellor properly dissolved restraining order and denied permanent injunction."

To like effect see 27 Am. & Eng. Ency. of Law 278.

IV. In oral argument defendants contended that plaintiff's action was barred by the statute of limitations. This defense was pleaded only to the claim for damages. It is not a proposition relied on for affirmance in the written argument, and is not argued therein. The court did not mention it as a basis for its decree. We question the soundness of this defense but do not pass on it.

V. Although defendants admitted in their answer that plaintiff was a licensed physician during the trial they urged that plaintiff had obtained his license to practice by fraud. It was not a pleaded issue, but we have read the record with care, and our conclusion is that it is without basis or merit.

The decree is—Affirmed.

THOMPSON, C. J., and OLIVER, WENNERSTRUM, GARFIELD, MULRONEY, and MANTZ, JJ., concur.

SMITH and HAYS, JJ., concur in result.