# Richmond

## Dr. Antoine Khoury, Et Al. v. Community Memorial Hospital, Incorporated.

January 15, 1962.

Record No. 5350.

Present, All the Justices.

*Aubrey R. Bowles, Jr.* (*Aubrey R. Bowles, III; James S. Easley; Franklin M. Slayton; Bowles, Boyd & Herod; Easley, Vaughan & Slayton,* on brief, for the appellants.

*J. Segar Gravatt* and *John Y. Hutcheson,* for the appellee.

*Eppa Hunton, IV* and *Harry Frazier, III* (*Lewis T. Booker; Hunton, Williams, Gay, Powell & Gibson,* on brief), for Virginia Hospital Association, *amicus curiae.*

CARRICO, J., delivered the opinion of the court.

Dr. Antoine Khoury filed a bill of complaint and, with leave of court, an amended bill of complaint against Community Memorial Hospital, Incorporated, hereinafter referred to as the hospital, seeking to enjoin his dismissal from the associate medical staff of the hospital and the withdrawal of his privilege to practice therein. The hospital filed a demurrer, which was overruled, and thereafter filed its answer. The chancellor heard the testimony *ore tenus* and entered a final decree dismissing the original and amended bills of complaint. We granted an appeal from this ruling.

There are twelve assignments of error to the rulings of the chancellor, which present the following questions for our determination:

1. Did Dr. Khoury have a contract with the hospital for the

use of its facilities as an associate staff member and, if so, may such contract be enforced by a court of equity?

2. Is the hospital a public hospital and, if so, have any rights of Dr. Khoury and his patients been contravened as a result of the hospital's denial of staff privileges to Dr. Khoury?

3. Was Dr. Khoury accorded a fair hearing with respect to the denial of staff privileges in the hospital?

R. G. Waters, the president of the town council of La Crosse, Virginia, C. W. Moseley, the then mayor of La Crosse and W. B. Kirkland, former mayor, were permitted to intervene by the chancellor as *amici curiae*. Their petition prayed that Dr. Khoury be granted the relief he sought. The Virginia Hospital Association has, with leave, filed a brief in this court as *amicus curiae*, in opposition to Dr. Khoury's contention that the hospital is a public institution.

The hospital is a non-stock, non-profit corporation chartered on July 6, 1950, pursuant to the provisions of Chapter 13, Title 13, Code of Virginia, 1950, as amended, "to establish, construct and maintain a regional hospital for the counties of Mecklenburg, Brunswick and Lunenburg, Virginia, to be located at South Hill. . . . for the treatment, healing and care of ill, wounded, disabled and diseased persons. . . . ."

The hospital was originally constructed at a total cost of approximately $825,000.00, $415,000.00 thereof contributed by the federal government in the form of funds authorized by the Hill-Burton Act (42 U.S.C.A., § 291, *et seq.*), $39,000.00 by the Commonwealth of Virginia and $372,000.00 by local subscriptions. An addition was constructed later at a total cost of approximately $322,000.00, consisting of $165,000.00 in Hill-Burton funds and $156,000.00 in local subscriptions.

By virtue of the charter, and the by-laws adopted pursuant thereto, management of the hospital is vested in a self-perpetuating board of trustees. The by-laws provide for the appointment of an administrator to serve as a representative of the board in the management of the hospital.

All appointments to the medical staff are made by the board of trustees. The staff is divided into five categories: honorary, consulting, active, associate and courtesy. An application for appointment to the staff is presented by the administrator to the staff secretary and thence to the staff itself, which may either reject the application or refer it to the credentials committee. If it is referred to the committee, the applicant is then investigated and a recommendation is made by

the committee to the medical staff, The staff thereafter makes its recommendation to the board of trustees. All such appointments are for a period of one year, renewable by the board without re-application.

Dr. Khoury is a native of Lebanon, but a naturalized citizen of the United States. He studied extensively in Lebanon, France, Jerusalem and England. After coming to this country he served an internship in the Aultman Hospital in Canton, Ohio, and became chief resident in surgery of that institution.

Dr. Khoury had a family, and since his position in the Aultman Hospital was not well paying, he decided to enter private practice. He became interested in coming to Virginia through the Virginia Council on Health and Medicine. He was licensed on December 6, 1958, to practice his profession in Virginia. He learned, from the health council, that the town of La Crosse was attempting to find a doctor to establish his practice there.

Dr. Khoury visited La Crosse on two occasions. On his second visit he conferred with the town officials, and also visited the hospital and conferred with its administrator, Thomas W. Leggett, and members of its medical staff. In these conferences Dr. Khoury stated that he would not consider moving to La Crosse unless he could secure the privilege of using the hospital for his patients.

On his return to Ohio, after his second visit to La Crosse, Dr. Khoury wrote to Mr. Leggett, stating that his decision to come to Virginia depended upon whether he would be afforded limited privileges in the hospital to perform certain surgical operations. Mr. Leggett sent Dr. Khoury the form to be used for applying for medical staff privileges, and in a forwarding letter stated, "As I discussed this matter with you the staff application goes to the credentials committee of the medical staff and then to the active staff for their action. After the active staff has acted on the application, it goes to the Board of Trustees for their action." Dr. Khoury returned his completed application to the hospital with a letter to Mr. Leggett, again stating that his decision to come to La Crosse depended upon his securing the privilege of "doing some surgery" in the hospital.

The officials of the hospital made inquiries concerning Dr. Khoury's background and received favorable responses thereto. Accordingly, his application was submitted to the credentials committee, which recommended to the medical staff that it be approved for associate "either in general medicine or general surgery not both." On May

19, 1959, the medical staff approved the recommendation of the credentials committee.

On June 4, 1959, Dr. M. L. Lacy, the secretary of the medical staff, wrote to Dr. Khoury advising him of the action of the staff, and explaining why privileges could not be granted for both medicine and surgery. In this letter it was stated that the staff approval "will be forwarded to the governing board of the hospital for final approval. . . ." In this letter Dr. Khoury was asked to decide which type of privilege he desired and to make a new application therefor so that it "may be submitted to the governing board of the hospital."

Upon receipt of this letter, Dr. Khoury telephoned Dr. Lacy. The details of this telephone conversation, upon which Dr. Khoury bases so much of his case, were in hopeless conflict in the testimony. Dr. Khoury testified that he asked Dr. Lacy if he should wait until the board of trustees had approved his application. According to Dr. Khoury, Dr. Lacy replied that the board approval was a formality and that he should come at once. Dr. Lacy, in his testimony, denied that he made any such statement to Dr. Khoury. However, as a result of this telephone conversation, Dr. Khoury's application was treated, by the hospital, as one for surgical privileges only.

Dr. Khoury resigned his position with the Ohio hospital and moved to La Crosse, arriving on July 3, 1959. He found it necessary to secure two loans to move his family and to equip his office.

Several days after his arrival in La Crosse, Dr. Khoury visited Mr. Leggett and had a conversation with him upon which Dr. Khoury places great emphasis. He testified that Mr. Leggett told him not to worry about the board of trustees, stating, "When the medical staff recommends somebody for privileges it has never happened that the Board of Trustees denied it so it is a question of formality only." Although called as a witness by Dr. Khoury, Mr. Leggett was not questioned concerning this phase of their conversation.

Dr. Khoury's name was placed on a list, in the lobby of the hospital, containing names of the members of the active and associate staffs. He was placed on a "rotating list" for the treatment of free patients. He was permitted to admit his own patients. He directed orders to the hospital personnel, which were honored. Mr. Leggett testified that these privileges were extended to Dr. Khoury on a temporary basis under authority of the by-laws of the medical staff.

On July 18, 1959, Dr. Khoury was called to the scene of an accident. He found that one Grant Thomas had been struck and run

over by a train. Thomas was believed, by a constable and an undertaker at the scene, to be dead but Dr. Khoury detected a sign of life. He administered emergency treatment and then removed Thomas to the hospital. Dr. Lacy and other members of the staff assisted Dr. Khoury in treating Thomas and his life was saved.

The incident which led to Dr. Khoury's dismissal arose out of the Thomas case. On July 19 Dr. Khoury ordered an x-ray of the patient's spine. The next day, Dr. J. A. Boyd, Jr., the radiologist at the hospital, took the x-rays and found that Thomas had suffered a severe fracture of the spine.

Dr. Boyd testified that when he reported the x-ray findings to Dr. Khoury, the latter, in the presence of hospital personnel, became highly excited when he found that Thomas was paralyzed and could not move his legs; that he pounded on the table and tried to "browbeat" Thomas into saying that he had been able to move his legs earlier in the day; that he implied that the paralysis had occurred or developed in the x-ray department, from which Dr. Boyd inferred that Dr. Khoury was placing the blame for the patient's paralysis on the x-ray department. In his testimony, Dr. Khoury denied that he made any accusation that the paralysis occurred in the x-ray room or that he spoke loudly or struck the table. Two nurses, who were intermittently present in the room, testified that although they did not hear the conversation between the two doctors, they heard no loud voices and saw no table pounding.

Dr. Boyd immediately went to see Dr. Lacy and told him that Dr. Khoury had made some remarks concerning the finding of paralysis "as if he thought" it was caused or aggravated by the handling of the patient in the x-ray room. Dr. Lacy testified that while Dr. Boyd was in his office Dr. Khoury telephoned and said that the patient had become paralyzed in the x-ray department, and requested the names of neuro-surgeons in Richmond to whom Thomas could be referred.

The credentials committee met the next morning and voted to ask Dr. Khoury to withdraw from the staff, except to care for his patients already in the hospital. The committee report, which was submitted to a meeting of the active staff on July 23, stated in part:

"It was reported to us, that Dr. Khoury made some remarks concerning the finding of paralysis and fractured back, as if he thought it was caused or aggravated by the handling of the patient in the x-ray room.

"The remarks, if correctly reported to us would certainly seem to be very unethical. . . . ."

The meeting of the active staff lasted three hours. Dr. Boyd was called before the committee and testified and was questioned concerning the Thomas incident. He was then excluded. Dr. Khoury was brought into the room and the committee report was read to him. He denied having accused Dr. Boyd of causing Thomas' paralysis, said the incident was a misunderstanding and offered to apologize. He was questioned concerning his treatment of Thomas, especially relating to the time he first detected paralysis in the patient. He was then excluded from the meeting. Thomas' chart was examined by the members of the staff, and the statements of other doctors connected with his case were considered.

By unanimous vote, the staff decided that Dr. Khoury was "guilty as charged of an instance of gross unethical conduct and . . . . that his application be recommended for non approval and his temporary privileges be rescinded."

Dr. Khoury's application for hospital privileges was presented to the board of trustees at a meeting of August 4, 1959. The report of the active staff, concerning its action of July 23, 1959, was read to the board by Mr. Leggett, and the application was unanimously rejected.

The hospital has filed a motion to dismiss this appeal on the ground that the issues raised by the bill and amended bill have become moot. In the view we take of the case, it is not necessary that we consider this motion.

■ We will assume, for the purposes of this appeal only, without so holding, that a contract would have come into existence if the board of trustees had, in fact, appointed Dr. Khoury to the staff.

We are of the opinion, however, that no contract came into being between Dr. Khoury and the hospital which obligated the latter to provide Dr. Khoury the use of the hospital facilities.

It is clear, from the by-laws, that the authority to make appointments to the medical staff rests solely with the board of trustees. While the approval of the credentials committee and the active staff is required, such approval is merely preliminary to the basic, all important requirement of appointment by the board of trustees.

The evidence shows that Dr. Khoury secured the approval of the credentials committee and the active staff. However, after the Thomas incident, and the staff's loss of confidence in Dr. Khoury as a result

thereof, this approval was withdrawn. It is uncontroverted that the appointment by the board of trustees, without which the contract could not exist, has never been made.

But, Dr. Khoury contends, the hospital is estopped to deny the existence of a contract because of Dr. Lacy's alleged statement to him in the telephone conversation of June 6, 1959.

It will be recalled that although Dr. Khoury testified that Dr. Lacy had urged him to come to La Crosse before the board approved his application, Dr. Lacy's testimony was a flat denial of the alleged statement. The chancellor, therefore, had before him two completely different versions of the same conversation, either of which might be credible and upon which he could make a finding of fact. That factual issue has been resolved, by the chancellor, against Dr. Khoury, and since the finding is supported by credible evidence, we cannot disturb it. This finding has the effect of establishing that Dr. Lacy did not say what he is supposed to have said. The alleged statement is not, therefore, available to Dr. Khoury, on this appeal, as evidence to support his theory of the case. *Cook* v. *Hayden*, 183 Va. 203, 210, 31 S. E. 2d 625; *Ring* v. *Ring*, 185 Va. 269, 271, 38 S. E. 2d 471.

Dr. Khoury also bases his theory of estoppel on Mr. Leggett's alleged statement to him that the board's approval was only a formality and on the hospital's actions in listing him as a member of its staff and in permitting him to use its facilities. It will be noted that all of these events took place after Dr. Khoury had resigned his position in Ohio and had moved to La Crosse. He could not, therefore, in so acting, have relied on anything that occurred after he arrived in Virginia.

The doctrine of equitable estoppel, or estoppel *in pais*, is not available to a party unless he can show that he has acted in reliance upon an action or statement of the other party. *Repass* v. *Richmond*, 99 Va. 508, 511, 39 S. E. 160; *County School Bd.* v. *First Nat. Bk.*, 161 Va. 127, 137, 138, 170 S. E. 625.

It should be noted that Mr. Leggett testified that the privileges which were accorded to Dr. Khoury were extended to him on a temporary basis, under authority of the by-laws, until the board had approved the doctor's application. We need not consider whether Mr. Leggett had such authority—the privileges were nonetheless temporary. The correspondence between Dr. Khoury and the hospital, relative to his application, shows conclusively that he knew of the mandatory requirement for approval by the board of trustees.

Until the trustees, in whom the authority was vested, had made his appointment, Dr. Khoury must be held to have acted at his own risk.

■ We next turn to the question of whether the use of federal and state funds for construction thereby constituted the hospital a public corporation.

The distinctions between a public and a private corporation have been so carefully drawn and so long recognized that we experience no difficulty in answering the question in the negative.

In *Trustees of Dartmouth College* v. *Woodward,* 4 Wheat. (17 U.S.) 518, 4 L. ed. 629, 668, Mr. Justice Story, of the Supreme Court of the United States, said, "[P]ublic corporations are such only as are founded by the government for public purposes, where the whole interests belong also to the government. If therefore, the foundation be private, though under the charter of the government, the corporation is private, however extensive the uses to which it is devoted, either by the bounty of the founder or the nature and objects of the institution."

The hospital is not owned by the federal or the state government, albeit federal and state funds may have made its construction possible. It is not an instrumentality of government for the administration of any public duty, although the service it performs is in the public interest. Its officers are not appointed by and are not representatives of government, notwithstanding that their authority stems from legislative enactments. Under these circumstances, the hospital falls squarely within the time-honored definition of a private corporation. *Wambersie* v. *Orange Humane Society,* 84 Va. 446, 454, 455, 5 S. E. 25; *Phillips* v. *University of Virginia,* 97 Va. 472, 475, 34 S. E. 66; *Maia* v. *Eastern State Hospital,* 97 Va. 507, 509, 34 S. E. 617; *Trevett* v. *Prison Ass'n.,* 98 Va. 332, 335, 336, 36 S. E. 373.

The evidence does not disclose that any conditions were attached to the funds contributed by the Commonwealth to the hospital. The only conditions connected with the federal funds were that the hospital was required, before obtaining such funds, to give assurances that it would treat certain indigent patients free of charge and that no person would be denied admission because of race, creed or color. These conditions are completely insufficient to convert the hospital into a public hospital. In fact, the Hill-Burton Act itself provides:

"Except as otherwise specifically provided, nothing in this subchapter shall be construed as conferring on any Federal officer or employee the right to exercise any supervision or control over the administration, personnel, maintenance, or operation of any hos-

pital. . . . with respect to which any funds have been or may be expended under this subchapter." (42 U.S.C.A., § 291(m)).

■ The hospital was established pursuant to a charter, granted by the Commonwealth, conferring upon its public spirited organizers the right and authority to operate as a private corporation. That charter is a contract between the state and the incorporators. One of the unwritten provisions of that contract is that the trustees of the corporation shall have the right to conduct its affairs as they might, in their sound discretion, see fit. Inherent in the charter is the understanding that, except as provided by law, the state will not interfere in the corporation's internal affairs. *Roanoke Cemetery Co.* v. *Goodwin*, 101 Va. 605, 611, 44 S. E. 769; *Collins* v. *Doyle*, 119 Va. 63, 69, 89 S. E. 88.

We are of the opinion that when the trustees of a private hospital, in their sound discretion, exclude a doctor from the use of the facilities of the hospital, the courts are without authority to nullify that discretion by injunctive process. There are no constitutional or statutory rights of the doctor, or of his patients who wish to be treated in the hospital by him, which warrant such interference. *Levin* v. *Sinai Hospital of Baltimore City*, 186 Md. 174, 46 A. 2d 298, 301, 303; *Edson* v. *Griffin Hospital*, 21 Conn. Sup. 55, 144 A. 2d 341, 345; *Akopiantz* v. *Board of County Com'rs of Otero County*, 65 N.M. 125, 333 P. 2d 611, 613; *Natale* v. *Sisters of Mercy of Council Bluffs*, 243 Iowa 582, 52 N. W. 2d 701, 709; 26 Am.Jur., Hospitals and Asylums, § 9, p. 592; 24 A.L.R. 2d 851.

■ The final question to be determined is whether Dr. Khoury was accorded a fair hearing relative to the denial of staff privileges in the hospital.

Since we have held that Dr. Khoury had no contractual, constitutional or statutory right to the use of the hospital facilities, and since the trustees acted in their sound discretion to deny him such use, we are of the opinion that he was not entitled to a hearing with respect to his exclusion therefrom. We need not consider, therefore, whether the hearing which was accorded him was a fair one.

For the first time in these lengthy proceedings Dr. Khoury asks, in his brief filed with us, that we decree that he is entitled to damages, as alternative relief. The issue of damages was not raised in the bill or amended bill, or before the chancellor, in any way. It will not be considered at this late date.

For the reasons given, the decree will be

*Affirmed.*