GOTSIS, APPELLEE, *v.* LORAIN COMMUNITY HOSPITAL ET AL., APPELLANTS.

(No. 2193—Decided October 16, 1974.)

*Messrs. Sindell, Sindell, Bourne, Stern & Guidubaldi,* for appellee.

*Wickens & Herzer Co., L. P. A.,* for appellant, Lorain Community Hospital.

MAHONEY, J.   Lorain Community Hospital, and the other defendants herein, are appealing a judgment of the Court of Common Pleas of Lorain County, enjoining the removal of the plaintiff (appellee), Doctor George P. Gotsis, from the medical staff of such hospital. The trial court premised its injunction upon the failure of the hospital, as a public hospital, to afford Doctor Gotsis. due process of law, in not reappointing him to its staff, in that not only did it not follow its own rules, regulations and procedures, but that such procedures did not afford Doctor Gotsis constitutional due process. Doctor Gotsis was a fully accredited physician, and surgeon, and certified by the American Board of Surgeons, and a member of the staff of St. Joseph Hospital, and Amherst Community Hospital.

Lorain Community Hospital is the business name for Lakeland Community Hospital, Inc., a nonprofit corporation under Ohio law. The articles of incorporation vest the management and government of the hospital in a board of trustees, whose duties include the adoption of by-laws,

10

rules, regulations, etc., for the hospital. The code of regulations provides for an executive committee, and an administrator, and, under Article V, a medical staff was created.[1] By-laws of the hospital corporation, pertaining to a medical staff were also established.[2]

[1]"Article V

"Medical Staff.

"Section 1

"The Board of Trustees shall appoint a medical staff composed of physicians and surgeons licensed to practice medicine in the state of Ohio. The medical staff shall be vested with the professional privileges, duties and responsibilities of the Hospital. It shall maintain a standard of ethical and professional performance satisfactory to the Board of Trustees.

"Section 2

"The business and professional management of the medical staff shall be conducted under bylaws and rules to be adopted by it not inconsistent with the Articles of Incorporation of the Corporation or these Regulations.

"Section 3

"The Board of Trustees shall appoint an initial medical staff upon application made to the Board; thereafter, all applications for appointment to the medical staff shall be in writing, made to the Administrator, who shall submit the same to the medical staff for approval and submission to the Board of Trustees for appointment.

"All appointments to the medical staff shall be for one year only, renewable by the Board of Trustees, upon recommendation of the medical staff, without reapplication.

"Section 4

"All applicants for appointment who are not appointed by the Board of Trustees, or any member of the medical staff who, after appointment, is dismissed or whose appointment is not renewed by the Board of Trustees, shall have the right of a hearing before an appropriate committee to be appointed by the medical staff for that purpose, and an appeal to the Board of Trustees from the determination of such committee, whose decision shall be final."

[2]"Sec. 1 (a) The Board of Directors (Trustees) shall appoint a medical staff composed of physicians who are graduates of recognized medical schools; shall see that they are organized into a responsible administrative unit and have adopted such by-laws, rules, and regulations for government of their practice in the Hospital as the Board deems to be of the greatest benefit to the care of patients within the Hospital. In case of the individual patient, the physician duly appointed to the Medical Staff shall have full authority and responsibility for the care of that patient subject only to such limitations as the Board may

The medical records committee and the surgical review committee each adopted rules and regulations pertaining to their internal government, which were approved by the medical staff, and the trustees. In the organization of the surgical department's review committee, it is provided:

"* * *

"II. Regulations and Policies of Surgical Department.

"* * *

"If in the judgment of the Chief of the Department a physician has abused his surgical privileges, the chief may call a meeting of the Departmental Review Committee for an investigation. Cause for such action would particularly include failure to attend departmental meetings where required; failure to operate within the scope of classification of privileges; failure to maintain high standards of competence to which the Surgical Department strives, based upon analysis of records plus Tissue Committee reports, or failure to comply with operating room policies. If the Committee should conclude that a physician is guilty of such infractions, it shall then present a written report as a failure to comply with operating room policies. If the Committee should conclude that a physician is guilty of such infractions, it shall then present a written report at a surgical meeting, where a recommendation to the Credentials Committee for limitation or revocation of surgical privileges would require a two-thirds vote of those active staff members of the Surgical Department having major surgical privileges. * * *"

formally impose, and subject to the By-Laws, Rules, and Regulations for the Medical Staff adopted by said Medical Staff and by the Board.

"(b) All applications for appointment to the Medical Staff shall be in writing and addressed to the Executive Director of the Hospital.

"(c) All appointments to the Medical Staff shall be for one year only, renewable by the Board without re-appointment.

"Sec. 2 By-Laws, Rules, and Regulations for the Medical Staff setting forth its organization and government shall be recommended by the Medical Staff and such by-laws as are approved by the Board of Directors (Trustees) shall become part of the By-Laws of the Medical Staff of the Lakeland Community Hospital, Inc., dba Lorain Community Hospital."

The rules and regulations of the medical department of Lorain Community Hospital provides:

"E. Committees.

"1. Departmental Review Committee.

"The Departmental Review Committee shall consist of the Chief of the Service and at least two additional members appointed by him. One of the members shall be a general practitioner. (By-Laws, Rules and Regulations of the Medical Staff, Article VII, Section II, Subsection II.) It shall be the responsibility of the committee to assure that the policies and regulations of the Department are adhered to. They may accomplish this purpose by review of active medical charts, order sheets and charts of patients previously discharged, or by direct interview with the physician involved. They will also review all charts of those patients whose death is unexpected. In those cases in which patient care is not deemed adequate, or in those situations in which the policies and regulation of the Department have been violated, the committee may handle the problem at the departmental level, or they may refer to the Credentials Committee for further consideration. * * *".

In January of 1972, the bed utilization review committee (BUR) made a report to the medical executive committee (MEX) on a survey of all charts concerning exploratory laparotomy surgeries performed at the hospital between January 1, 1971, and July 1, 1971. The reports indicated that there were charts on five patients of Doctor Gotsis, showing questionable justification for surgery.

On January 31, 1972, MEX requested the medical records committee (MRC) to pay particular attention to the quality of any charts that they reviewed on patients of Doctor Gotsis. The MRC, according to the testimony of its chairman, Doctor Radefeld, then voted to review all the cases of Doctor Gotsis involving incisional hernias, and lysis of adhesions, performed during 1971. On September 26, 1972, the MRC reported, in writing, to MEX, and, in substance, questioned not only the necessity of many surgeries but, also, the skill and adequacy of their performance.

MRC furnished the surgical department review commit-

tee (SRC) with a copy of the report. The SRC met, discussed the report, and the thirty-seven records in question. On September 30, 1972, it adopted the following resolution: '

"* * * [T]his committee concurs with the review of these cases and recommends strong punitive action be taken by the Executive Committee such as suspension of privileges or whatever the Executive Committee deems appropriate."

On October 9, 1972, SRC met again and rescinded its previous action on the belief that it was without authority to make recommendations to MEX but could only report to its own department. This it did by adopting a motion that the "surgical section of the medical staff take strong corrective action * * *." The department of surgery (DS) met that same night, after the SRC meeting, and, by a vote of ten to four decided that Doctor Gotsis should be given a reprimand by the DS for his inadequate charts. Doctor Gotsis participated in and was present during all of the discussion that preceded the adoption of the DS "strong corrective action" resolution.

MEX met on September 26, 1972, and considered the report of the MRC, and the actions taken by the SRC and the DS. Thereupon, they adopted the following motions:

"For the months of November, December, and January, Dr. Gotsis must have consultation on all ventral hernias, lysis of adhesions, and exploratory laparotomies from a physician with major surgical privileges.";

"* * * on the basis of the letter from Dr. Radefeld, Chairman of Medical Records, all major surgical cases performed by Dr. Gotsis be reviewed by the Surgical Review Committee for the months of November, December and January.";

" * * * that Dr. Gotsis' reappointment to the staff be a temporary appointment with permanent appointment being contingent upon a favorable review of his charts by the Surgical Review Committee for the months of November, December, and January * * *."

Thereafter, on October 31, 1972, the hospital's board of directors (HBD) met and adopted the recommendations

of MEX. Doctor Gotsis, although present, was also notified by mail of the decision of MEX. The HBD minutes reflect that the credentials committee joined in the "temporary appointment of Gotsis."

Undisputed testimony shows that, by custom, appointments to the hospital medical staff were for the calendar year, and re-appointments were usually submitted to the board in its October meeting.

The minutes of October 9, 1972, of the meeting of the credentials committee (CC), show that a motion was passed moving the reappointment of all members of the medical staff, in their current status, with certain exceptions. No exception was made as to Doctor Gotsis. The testimony does not show that the CC considered or was aware of the MRC report, or the action taken by SRC, or the DS...

Doctor Gotsis did not appeal or request any hearing under the rules and regulations of the medical staff (MS), and his testimony indicates an acceptance of their decision, and a belief that he would perform, as requested, and not encounter any further difficulty.

Thereafter, the SRC went over the charts of Doctor Gotsis for November, December, and January, and relayed reports to the MEX. Finally, on March 29, 1973, the MEX adopted the following motion:

"That on the basis of the original report by the chairman of the Medical Records Committee and the three-month survey by the Surgical Review Committee, Dr. George Gotsis not be reappointed to the Medical Staff as of April 1, 1973 * * *."

Doctor Gotsis was notified, on March 30, 1973, personally and by mail, of that action of MEX, and of his right to appeal, under the by-laws and regulations of the MS and LCH.

Upon receipt of the letter from Mr. West, the hospital administrator, Doctor Gotsis, on March 30, 1973, commenced this action in the Court of Common Pleas of Lorain County and was granted a temporary injunction against his removal from the staff, and, after trial, the injunction was made permanent.

From that judgment, the Hospital appeals and sets forth twenty-four assignments of error.

All of the assignments of error will be answered by a determination of the following issues raised by the facts of this case:

I. Was there sufficient "state action" involved to require the Hospital to afford Doctor Gotsis constitutional "due process"?

II. Did that "state action" cause the "wrong" of which Doctor Gotsis complains?

III. If so, what standard of "due process" is applicable?

IV. If "state action" was not involved in this case, is it one that the judiciary should abstain from reviewing?

V. If this is not a case of abstention, how far should the judiciary inquire?

The test for determining "state action" is whether or not there was significant state involvement in the private conduct warranting the application of constitutional due process; and that action must proximately result in the injury which is the subject of the complaint. The "due process" clause of the Fourteenth Amendment to the United States Constitution does not provide any shield against private conduct abridging a person's constitutional rights, unless it is done under color of state law. See: *Mulvihill* v. *Butterfield Memorial Hospital* (S. D. N. Y. 1971), 329 F. Supp. 1020; *Civil Rights cases* (1883), 109 U. S. 3; and *Adickes* v. *S. H. Kress & Co.* (1970), 398 U. S. 144.

Lorain Community Hospital is open to the public, but it is managed by a private board of trustees. The city of Lorain owns the hospital but leases it to a private non-profit corporation, and takes no part in its operation. The city has no right, under the lease, to formulate or carry out any rules or regulations with respect to the granting and withdrawal of the right to practice medicine in the hospital.

Courts have held, and we agree, that the receipt of Medicare funds, or other funds recovered for the care of indigents, is not "significant state action." See *Ward* v.

*St. Anthony Hospital* (C. A. 10, 1973), 476 F. 2d 671; *Monyek* v. *Parkway General Hospital* (Fla. 1973), 273 So. 2d 430; and *Shulman* v. *Washington Hospital Center* (D. C. Dist. 1963), 222 F. Supp. 59, modified in part in 348 F. 2d 70.

Likewise, being "open to the public" does not mean that the hospital is public in the sense of governmental action, nor is it, in fact, performing an ordinary function of the government. See: *Edson* v. *Griffin Hospital* (1958), 21 Conn. Supp. 55, 144 A. 2d 341; *Natale* v. *Sisters of Mercy* (1952), 243 Iowa 582, 52 N. W. 2d 701; and *Khoury* v. *Community Memorial Hospital* (1962), 203 Va. 236, 123 S. E. 2d 533.

We further hold that R. C. 749.35 means basically that the hospital must be "open to the public," and not public in the sense of constitutional "state involvement." See *Akopiantz* v. *Bd. of County Commrs.* (1959), 65 N. M. 125, 333 P. 2d 611.

Even if we were to say that there was sufficient "state involvement" to make it a public hospital, Doctor Gotsis has failed to show that the "state action" caused the alleged wrong about which he complains. See *Doe* v. *Bellin Memorial Hospital* (C. A. 7, 1973), 479 F. 2d 756; *Powe* v. *Miles* (C. A. 2, 1968), 407 F. 2d 73; *Place* v. *Shepherd* (C. A. 6, 1971), 446 F. 2d 1239; *Ward* v. *St. Anthony Hospital, supra; Mulvihill* v. *Butterfield Memorial Hospital, supra;* and *Watkins* v. *Mercy Medical Center* (D. Idaho 1973), 364 F. Supp. 799.

Doctor Gotsis argues that the state is involved under the standards of *Moose Lodge No. 107* v. *Irvis* (1972), 407 U. S. 163; *Shelley* v. *Kraemer* (1948), 334 U. S. 1; *Evans* v. *Newton* (1966), 382 U. S. 296; *Burton* v. *Wilmington Parking Authority* (1961), 365 U. S. 715; *Marsh* v. *Alabama* (1946), 326 U. S. 501; *Meredith* v. *Allen County War Memorial Hospital Commn.* (C. A. 6, 1968), 397 F. 2d 33. None of these cases have any application to the case before us. In *Moose Lodge* v. *Irvis, supra,* the Supreme Court affirmed the denial of club privileges to a negro by a private fraternal order which had a club liquor license issued by the state of Pennsylvania. *Shelley* deals with racially

restrictive covenants in deeds which the Supreme Court held could not be enforced in state courts. The *Evans* case tore away the screen of a private board of trustees set up by a Georgia court to avoid "state involvement," and prevent negroes from using land willed to a city to be used as a park "for white persons only." The *Marsh* case imposed constitutional guarantees on the Gulf Ship Building Corporation, which owned the "company town" of Chickasaw. The *Burton* case was also a racially oriented case where the city owned the parking deck and leased the restaurant to a private operator. The Supreme Court held that, because of the peculiar nature of the lease, there was "state action," but said, at page 725:

"Because readily applicable formulae may not be fashioned, the conclusions drawn from the facts and circumstances of this record are by no means declared as universal truths on the basis of which every state leasing agreement is to be tested. * * *"

Obviously, the *Burton* case would be handled as a straight "civil rights case" today. The *Meredith* case is distinguishable because the hospital governing body was appointed by the county. Further, in that case, the complainant alleged that there was a conspiracy between physicians and state officials to remove him from the staff.

It has been clearly established that Doctor Gotsis does not have a constitutional right to practice medicine in a particular hospital, whether private or public. See *Hayman* v. *Galveston* (1927), 273 U. S. 414; *Woodbury* v. *McKinnon* (C. A. 5, 1971), 447 F. 2d 839 and *Duffield* v. *Memorial Hospital Assn.* (S. D. W. Va. 1973), 361 F. Supp. 398.

We, therefore, conclude, upon the first issue, that there was not any "state action" involved so as to impose requirements of constitutional "due process" upon Lorain Community Hospital, which we find to be a private hospital. We also conclude that even if it were considered a "public hospital," the alleged "state action" did not, in any way, cause the dismissal of Doctor Gotsis from the medical staff. Accordingly, we need not determine the applicable standard of "due process."

18

We pass to the fourth and fifth issues which relate to whether or not the trial court should have abstained from reviewing this case and, if reviewable, the extent of such review.

There is considerable authority for the proposition urged by Lorain Community Hospital that it is a private hospital and vested, with absolute discretion, to terminate the medical staff privileges of Doctor Gotsis without judicial scrutiny. See *Edson* v. *Griffin Hospital, supra; Shulman* v. *Washington Hospital Center, supra; Natale* v. *Sisters of Mercy, supra; Leider* v. *Beth Israel Hospital Assn.* (1961), 229 N. Y. Supp. 2d 134, affirmed 11 N. Y. 2d 205; *Khoury* v. *Community Memorial Hospital, supra; West Coast Hospital Assn.* v. *Hoare* (Fla. 1953), 64 So. 2d 293; *Moore* v. *Andalusia Hospital, Inc.* (1969), 284 Ala. 259, 224 So. 2d 617; and *Monyek* v. *Parkway General Hospital, supra.*

However, some of those courts which advocate judicial abstention still hold that a private hospital must comply with the procedural requirements prescribed by its own charter, constitution, by-laws, rules and regulations. *Shulman* v. *Washington Hospital Center, supra.*

Some courts say that this review in equity arises by virtue of the doctor's contractual relationship with the hospital. *Berberian* v. *Lancaster Osteopathic Hosp. Assn.* (1959), 395 Pa. 257, 149 A. 2d 456. Still other cases hold that, where a private hospital is open to the public, uses federal funds and has a virtual monopoly in the area in which it operates, it is still non-governmental, but acts in a fiduciary capacity for the public. Its decisions concerning members of its staff must rest on sound, reasonable judgment, and the courts will not intervene, unless the judgment is arbitrary, capricious or discriminatory. See *Davidson* v. *Youngstown Hosp. Assn.* (1969), 19 Ohio App. 2d 246; *Greisman* v. *Newcomb Hospital* (1963), 40 N. J. 389, 192 A. 2d 817; and *Woodard* v. *Porter Hospital* (1966), 125 Vt. 419, 217 A. 2d 37.

Therefore, in answer to the fourth and fifth issues, we concur with the reasoning of the *Shulman* case, and hold that a private hospital, in the absence of "state involve-

ment,'' has total discretion in the selection and retention of members of its medical staff, subject only to the requirement that it follow its own charter, by-laws, rules and regulations.

The last question to be decided is whether or not, in the instant case, the Lorain Community Hospital followed its own charter, by-laws, rules and regulations. We find that it did not, in the following respects:

1. There is no provision in the articles of incorporation, by-laws, rules or regulations of the hospital which permit staff appointments for any period other than one year, or for probationary periods, as erroneously ordered by the Board on October 31, 1972.

2. The medical executive committee was without authority to ''not reappoint'' Doctor Gotsis, on March 29, 1973, since their only authority was to make a recommendation to the hospital's board of directors. Sections 4(3) and 4(5), Article III, of the by-laws adopted by the medical staff for its operation, which were approved by the hospital board of trustees, provide as follows:

''3. Application for reappointment to the same classification of Medical Staff membership need not be made in writing. Such presumed application for reappointment, however, shall be subject to the jurisdiction of the Executive Committee, the Credentials Committee, and the Governing Body, as was the original application.''

''(5) On receipt of the report of the Credentials Committee, the Executive Committee shall immediately recommend to the governing body that the application be accepted, deferred, or rejected, and if accepted the privileges to be granted.''

3. It failed to give Doctor Gotsis a hearing before a medical staff committee, and an appeal to the board of directors, as provided in the code of regulations of the hospital.

4. There is a conflict between the authority of the medical executive committee to act on the report of the medical records committee without a recommendation of the credentials committee, as provided in Article VII, Section 2(1)

(4) of the medical staff by-laws, and the authority vested in the credentials committee to review qualifications as provided in Article VII, Section 2(3). Article VII, Section 2 (1) provides in part:

"The duties of the Executive Committee shall be as follows: * * * (4) to receive, consider, and set on all reports and recommendations of special and standing committees of the Medical Staff * * *."

Article VII, Section 2(3), provides:

"The duties of the Credentials Committee shall be as follows: * * * (3) To review any records that may be referred by the Executive Committee and to arrive at a decision regarding the performance of a staff member, and to refer the case back to the Executive Committee with a recommendation.

"(4) To review all information available, including a report from the respective Departmental Review Committee if necessary, regarding the competence of staff members and as a result of such reviews to make recommendations for the granting of privileges, reappointments, and the assignment of members of the various Departments and Sections." This conflict is resolved in favor of the action of the medical executive committee, since it was later ratified by the hospital's board of directors.

5. There is a conflict between the appeal rights, under the code of regulations, and Section 5 of the medical staff by-laws, which, of course, is resolved in favor of the code of regulations.

The code of regulations, Article V, Section 4, states:

"All applicants for appointment who are not appointed by the Board of Trustees, or any member of the medical staff who, after appointment, is dismissed or whose appointment is not renewed by the Board of Trustees, shall have the right of a hearing before an appropriate committee to be appointed by the medical staff for that purpose, and an appeal to the Board of Trustees from the determination of such committee, whose decision shall be final."

Article III, Section 5, Appeals, of the medical staff by-laws provides:

"Subsection 1. In any case where the Credentials Committee or Executive Committee does not recommend for appointment, or reappointment, or for privileges as requested, or where reduction of privileges is recommended, the Administrator or Executive Director shall notify the physician concerned and he shall be given an opportunity of appearing before the Credentials Committee and the Executive Committee in joint session."

6. There is a conflict between the reprimand action taken by the department of surgery, upon the recommendation of the surgical department review committee, under surgical department rules, and the action of the medical executive committee on October 26, 1972, in giving Doctor Gotsis temporary probationary status, and which conflict is resolved in favor of the medical executive committee under medical staff by-laws.

We have reviewed all of the assignments of error, pursuant to our resolution of the various issues, and we modify the judgment of the trial court to provide that the Lorain Community Hospital shall be enjoined from removing Doctor Gotsis from its medical staff until such time as a hearing and an appeal are had, pursuant to the hospital's code of regulations. The judgment of the trial court is reversed as to that part which enjoins the Lorain Community Hospital, its agents, etc., from using the "Radefeld" report in any manner or making it available to others.

Therefore, we remand this case to the trial court for further proceedings, according to law, pursuant to the decision of this court.

*Judgment modified in part and reversed in part, and cause remanded.*

VICTOR, P. J., and HUNSICKER, J., concur.

HUNSICKER, J., retired, assigned to active duty under authority of Section 6(C), Article IV, Constitution.