# Richmond

AMERICAN SECURITY AND TRUST COMPANY v. JOHN J. JULIANO, INCORPORATED, ET AL.

October 8, 1962.

Record No. 5477.

Present, All the Justices.

*Edmund D. Campbell* (*Griffin T. Garnett, Jr.,* on brief), for the appellant.

*Hardee Chambliss,* for all appellees except Arlington Trust Company, Inc.

Spratley, J., delivered the opinion of the court.

This is a suit instituted by American Security and Trust Company, sometimes hereinafter referred to as the bank, to obtain the judicial foreclosure of a deed of trust upon certain real property executed to secure a negotiable note for $20,000.00 held by it.

The evidence presented entirely by complainant's witnesses and heard *ore tenus* before the chancellor, is not in dispute. The facts and circumstances are set forth below.

On December 18, 1959, John J. Juliano, Inc., a builder of houses, executed and delivered to McIntosh & McIntosh, Inc., its negotiable, promissory note for $20,000.00, payable on or before six months after its date, to the order of McIntosh & McIntosh, Inc., at the office of the latter in Arlington, Virginia, with interest at 6% per annum. It was endorsed by John J. Juliano and Mary Juliano, and secured by a deed of trust from John J. Juliano, Inc., conveying Lot 29, Section 3, Varsity Park, Alexandria, Virginia, to Arlington Trust Company, Inc., trustee, duly recorded.

McIntosh & McIntosh, Inc., sometimes hereinafter referred to as McIntosh, endorsed the note "without recourse," and pledged and delivered it to the bank as collateral security for a $20,000.00 note, dated January 11, 1960, made by McIntosh, payable to the bank June 20, 1960, with interest at 5¾% per annum. The bank advanced to McIntosh the total sum of $19,000.00 on the latter's direct note

secured by the collateral, during the period from January 11, 1960 to April 22, 1960. The full amount advanced by bank to McIntosh was paid by the latter to John J. Juliano, Inc., on a construction loan to the latter. The note made by McIntosh was past due and unpaid in the sum of $19,000.00 at the time of the institution of this suit. There was no payment, interest or principal, made to the bank on the note held by it as collateral, which was also past due.

John J. Juliano, Inc., the maker of the December 18, 1959 note, is a building contractor in the Arlington, Virginia, area. McIntosh & McIntosh, Inc., was a well-known mortgage broker corporation, and engaged in the business of making construction loans to builders of houses. The loans were evidenced by negotiable, promissory deed of trust notes made by building contractors, payable to McIntosh. From time to time McIntosh borrowed money from banks in the Washington, D. C. Metropolitan Area, in order to make such loans. As collateral security for such borrowing, it pledged with the banks the deed of trust notes it secured from its customers. In the course of its business it had obtained from complainant bank at least 277 loans of this character since 1950. The January 11, 1960 note of McIntosh and the collateral therefor, the subject of this litigation, was one of a series of such transactions.

McIntosh maintained a special deposit account with complainant bank, which, for the convenience of it and the bank in handling construction loans, was termed a "Warehouse Account." As builders made progress in their construction work, bank advanced moneys to that account of McIntosh, from the proceeds of the notes of McIntosh, the amount of each advance being based upon a certificate of progress in construction, filed by McIntosh. The bank had no control over the disposition which McIntosh made of money credited in its "Warehouse Account."

The bank, in making a routine title insurance check-up on September 22, 1960, with Bendheim, Fagelson, Bragg & Giammittorio, title attorneys, hereinafter referred to as the Bendheim firm, who had issued the original title insurance binder on the property described in the deed of trust securing the December 18, 1959 note, was informed by the Bendheim firm that the note had been paid. This was the first notice bank had that anyone claimed that the December 18, 1959 note, held as collateral security by it, had been paid. The bank immediately wrote McIntosh, demanding additional collateral for the note of January 11, 1960, and when this was not forthcoming, called the loan evidenced by that note.

Unknown to complainant bank, John J. Juliano, Inc., had, on April 29, 1960, sold and conveyed Lot 29, Section 3, Varsity Park, Alexandria, Virginia, to Edward E. Scheer and Mary B. Scheer, his wife. Settlement of the sale was had at the office of the Bendheim firm. In order to finance their purchase, the Scheers borrowed funds from Northern Virginia Savings & Loan Association, and executed and delivered a deed of trust upon Lot 29, securing a note payable to the said Savings & Loan Association in the sum of $23,500.00. The Scheers further executed another deed of trust on the same property, securing a note payable to John J. Juliano, Inc., in the sum of $5,450.00. Both deeds of trust were recorded, but the deed of trust securing the note held as collateral by complainant bank was never released.

On April 29, 1960, Mrs. Edith Mae Peed, an employee of the Bendheim firm, which handled the settlement of the transaction between Juliano, Inc., and the Scheers, telephoned McIntosh & McIntosh, Inc., and talked with Mr. McQueen, a Vice-President of that firm. Said she: "I told him I wanted the pay-off information for a note made by John J. Juliano, Inc., secured on Lot 29, Section 3, Varsity Park, and I told him I wanted interest figured to the 30th of April and daily rate thereafter." He replied that he would call her back. She later called McQueen again, and he told her: "The principal balance was $19,000.00; interest to the 30th of April was $83.83, and the daily rate of interest thereafter was $3.03. And I verified with him that he would return the note to us and that we would secure the release on it."

Mrs. Peed testified that she did not ask McQueen whether or not McIntosh held the note, and that McQueen did not mention that subject, or give to her any information relative thereto. She said: "I had no doubts" as to who then held it.

Assuming that McIntosh held the Juliano note of December 18, 1959, and would forward it to her firm, Mrs. Peed mailed a check of her firm, payable to McIntosh & McIntosh, Inc., for the sum of $19,123.60, dated May 12, 1960. The check bore the notation: "FOR Pay-off & rel.: John J. Juliano, Inc.:-Lot 29, Sec. 3, Varsity Park, Alex., Va." McIntosh deposited the check to its credit, in its "Warehouse Account," in complainant bank on May 13, 1960. Thereafter, McIntosh instead of transferring the proceeds of the check to the bank in payment and satisfaction of the December 18, 1959 note, and at the same time receiving credit accordingly on its January 11, 1960 note, applied the proceeds to other purposes. There is no evidence that any officer or note teller of the bank handling the notes of McIntosh

had knowledge of the deposit of May 13, 1960 with the receiving teller, or of the misappropriation of the deposit.

Mrs. Peed said that the procedure which she followed in transmitting the check to McIntosh was identical with her practice "with respect to all other lots which she had handled involving construction loans where McIntosh & McIntosh, Inc. was the mortgage broker." She knew that McIntosh was the mortgage broker in the transaction relating to Lot 29, because it was named as the payee of the Juliano notes in the deed of trust securing same. In the absence of notice that a bank had bought such a note, she said, the only inquiry which she made was as to who is "the payee of the note."

There is evidence that officers of the complainant bank knew that, in this area, when construction loans were involved, it was customary for title or settlement attorneys to transmit to the mortgage broker the principal and interest due on a negotiable deed of trust note where the broker was the original payee of the note, assuming that such payment would be used by the broker to satisfy the note. There is evidence that complainant bank knew that title attorneys, from time to time, paid funds to McIntosh, in order that "it could pick up its pledged collateral," a practice which bank did not object to, because it "assumed that we were protected by law and that whatever the title company did was their business. He (McIntosh) was their agent, not ours."

There was no evidence that the Bendheim firm, the Juliano Corporation, the Julianos, or the Scheers had any knowledge of the 277 former collateral loans made by complainant bank to McIntosh, or that they relied on any "customary method" used by McIntosh in its relations with the bank. In none of the instances where complainant bank had made loans on collateral to McIntosh did the bank receive payment from McIntosh on the collateral pledged therefor.

There was no evidence that the bank had any oral or written agreement with respect to the servicing or collection of interest on notes which McIntosh had deposited as collateral, or that the bank had given or held out to McIntosh any authorization to make collection, in part or in whole, of the principal of such notes.

Robert McIntosh, executive Vice-President of McIntosh & McIntosh, Inc., testified that in making collection on notes deposited by his corporation as collateral and in transmitting funds from said collections to the bank, his corporation was acting solely on behalf of itself. McIntosh & McIntosh, Inc., is now insolvent and in receivership.

Bank made written demand upon the makers and endorsers of the

Juliano note of December 18, 1959, for payment and, when default was made, requested Arlington Trust Company, Inc., as trustee, to advertise and sell the real property conveyed under the deed of trust from Juliano, Inc. The trustee declined the request "until the adverse claims of the parties had been amicably settled or judicially determined." Bank thereupon instituted this suit against John J. Juliano, Inc., John J. Juliano, Mary Juliano, Edward E. and Mary B. Scheer, and the trustees in the deeds of trust hereinabove mentioned.

Bank prayed for a decree authorizing sale of Lot 29, Section 3, under the Juliano deed of trust, in such manner and on such terms as the court might deem proper for the satisfaction of the note secured thereby, and for such other further and general relief as might be necessary and proper.

All defendants, save Arlington Trust Company, Inc., trustee, answered averring that complainant bank had "expressly or impliedly" authorized McIntosh & McIntosh, Inc., to collect payments due on the December 18, 1959 note, because it had never raised any objection to the general custom of title attorneys in the northern Virginia area to transmit to a mortgage broker the principal and interest due on a negotiable deed of trust note, on which the broker was the original payee, where construction loans were involved in real estate transactions; and that the bank, with notice of such general custom, had acquiesced therein and held out McIntosh as having authority to collect payments on notes held by bank as collateral; and was, therefore, estopped to deny that McIntosh was its ostensible agent.

The defendants also filed a cross-bill praying that the clerk of the court be directed to release the deed of trust of December 18, 1959, because the note secured thereby had been paid. The cross-bill was answered by bank and the right to relief asked for denied.

The chancellor held that complainant bank was not entitled to the relief prayed for in its bill; that defendants and cross-plaintiffs were entitled to have the lien of the deed of trust of December 18, 1959, securing the Juliano note released; directed the clerk of the court to make an entry on the margin of the page where the deed of trust was recorded, stating that the note secured thereby had been paid in full and satisfied; and ordered that the bill of complainant bank be dismissed. A decree was entered accordingly, and from that decree the complainant bank was granted an appeal.

The basic and controlling question is whether the trial court erred in holding, under the facts and circumstances herein stated, that the

Juliano note of December 18, 1959, had been paid and discharged by the transmission of the amount due thereon to McIntosh and McIntosh.

The Juliano note of December 18, 1959, is a negotiable note. The bank was a bona fide holder of it for value in due course. As pledgee, it was not affected by a payment made by the maker to the original payee, although made in good faith, without knowledge of the assignment by the payee as collateral security, unless the maker can prove that such payment was made to an authorized agent of the pledgee or was subsequently ratified by it. *Anderson* v. *Union Bank*, 117 Va. 1, 5, 6, 83 S. E. 1080.

Payment is an affirmative defense, and where an indebtedness or obligation to pay has been established, the burden rests on the party claiming payment to show that the one receiving payment was authorized to do so. One making payment to an agent has the burden of showing that the agent has either express or apparent authority to receive such payment upon behalf of his principal, and the evidence to that effect must be clear and convincing. If payment is made to a party who does not have in hand the obligation, the debtor takes the risk of such party having the authority to make collection. *Snidow* v. *Woods*, 198 Va. 692, 695, 696, 96 S. E. 2d 157; *Baldwin* v. *Adkerson*, 156 Va. 447, 158 S. E. 864, 103 A. L. R. 644; *State National Bank of St. Louis* v. *Hyatt*, 75 Ark. 170, 86 S. W. 1002.

It is undisputed that complainant bank did not have any written or oral agreement with McIntosh with respect to the servicing or collection of real estate notes, which McIntosh had deposited with the bank as collateral. It is clear from the testimony of Robert McIntosh that when his firm accepted the payment of principal and interest on notes which had been deposited as collateral with the bank, it was acting "directly on behalf of McIntosh & McIntosh." The burden was on defendants to show that the acts and conduct of the bank, known to them, established McIntosh as the apparent or ostensible agent of the bank.

We find no support for the suggestion that the custom prevailing in the northern Virginia area under which mortgage brokers accepted funds from title attorneys for the payment of notes, not in the brokers' possession, made the brokers apparent or ostensible agents to receive payment upon behalf of the note holder. Here, the Bendheim firm did not know that the bank was the holder of the note. It made no inquiry as to who was the holder. It thought that McIntosh was the holder, and made payment to it as such. When it transmitted the

funds to McIntosh, it could not have regarded McIntosh as an agent when it did not know of the existence of a principal. It could not have relied upon a relationship, the existence of which it did not know. It relied not on any supposed apparent authority of McIntosh, but solely on McIntosh to satisfy and discharge the debt and return the note to it. It took that risk, and McIntosh failed in its duty.

It is clear from Mrs. Peed's own testimony that her firm transmitted the check payable to McIntosh not because she thought McIntosh had authority to receive the funds as agent for the bank, but because she thought McIntosh & McIntosh, Inc., was the noteholder and relied upon it to return the note of December 18, 1959, to her firm.

■ A party cannot claim an estoppel unless he has been misled to his injury by relying upon the conduct of the other party. To constitute an estoppel by conduct, the misrepresentation must be plain, not doubtful, or a matter of mere inference. There must be actual conduct calculated to impress upon the mind of another a belief in a certain state of facts. *Heath* v. *Valentine*, 177 Va. 731, 15 S. E. 2d 98; Volume 7, Michie's Jurisprudence, Estoppel, § 19, page 269; 2 Am. Jur., Agency, § 104, page 86 *et seq.*

The title attorneys and the real estate brokers selected the procedure which they followed in the settlement of real estate transactions, where construction loans were involved. There is no evidence that complainant bank was ever consulted with reference to such procedure. The mere fact that the bank accepted payment of collateral held by it from a broker was of no more significance than its receipt by means of the mail or by messenger service. The channel through which pay-off funds came, or the instrumentality which forwarded them was the concern of the party paying the note. The bank naturally accepted payment, and it had an office and fully equipped staff for that purpose. The evidence fails to show as a matter of law and of equity that complainant bank, by its conduct and acts, held out McIntosh as its agent to collect payment of the December 18, 1959 note.

The determination of this case is controlled by the rules stated in *Baldwin* v. *Adkerson, supra.* There we said, page 459:

"The general rule is that when the maker of a note either before, at or after its maturity, leaves or deposits with a bank or trust company [a mortgage broker in this case] at which his note is payable, but which has not possession thereof, the funds with which to pay the note on presentation for payment, in the absence of actual or ostensible authority from the legal holder of the note to the bank or trust com-

pany [the mortgage broker here] to receive payment thereof for him, the bank or trust company [the mortgage broker here] is the agent of the maker to pay the note, and not the agent of the holder of the note to receive payment thereof, and this is true even though the bank or trust company [the mortgage broker here] may have been the original payee or holder of the note."

In an annotation entitled, "Right of one who deals with another as principal to set up latter's apparent authority as agent," 95 A. L. R. page 1320, this is aptly said:

"In substance, although, perhaps, not in verbiage the cases are virtually unanimous in support of the rule that one who, whether with or without information of the existence of an agency, deals with an agent not only as the nominal, but as the real, principal, is not entitled to hold the true principal to the extent of a merely 'apparent' or 'ostensible', not actual, authority of the agent, as agent,— unless, of course, the principal in some way adopts the transaction, or claims its fruits under circumstances making it unjust that he should not be bound thereby."

The fact that the bank knew of the general custom followed by title attorneys and mortgage brokers in dealing with construction loans, is not sufficient to take the case out of the general rules stated in *Baldwin* v. *Adkerson, supra.* There was nothing in the practice of that custom to show any authority on the part of the brokers to act as agents for the lending banks. Under the procedure followed in this case, McIntosh, the broker, became the agent of the title attorneys to pay the note, and not the agent of the bank to receive payment on its behalf. *Baldwin* v. *Adkerson, supra; Bromley* v. *Lathrop,* 105 Mich. 492, 63 N. W. 510.

Defendants strongly rely on *Equitable Life Assurance Society of the U. S.* v. *Lazarus, et al.,* 207 N. C. 63, 175 S. E. 705. In that case the court affirmed a judgment of the trial court, based on findings of fact by the trial judge, pursuant to stipulation of the parties, which were supported by the evidence. The facts found in that case make the holding inapplicable to this case.

Cases from other jurisdictions relied on by the defendants furnish no support to their contentions here, either because of a difference in facts, or some feature of ratification, adoption or estoppel, upon which the liability of the principal has been based, independently of any supposed apparent authority of the agent.

For the foregoing reasons, the decree of the lower court is reversed and set aside; the bill of the complainant bank reinstated; and

the cause remanded to the trial court with direction to grant the relief prayed for by complainant bank, in accordance with the views expressed herein.

*Decree reversed and remanded.*