# CIRCUIT COURT OF THE CITY OF RICHMOND

Frank A. Wood, Jr.,
and William H. Jones, Jr.

v.

Short-Hagy, L.P.

January 30, 2001

Case No. HN-1142-4

BY JUDGE RANDALL G. JOHNSON

This is an action to require the clerk of court to mark a deed of trust "satisfied." At issue is the proper rate of interest to be applied to a note.

On July 21, 1992, James and Margaret Stallings executed a promissory note payable to the current plaintiffs, Frank A. Wood, Jr., and William H. Jones, Jr., in the principal amount of $135,000 with interest at the rate of 9% per year. Payments of principal and interest were to be made in equal monthly installments of $1,214.63 beginning August 21, 1992, and continuing on the 21st day of each month thereafter until July 21, 2002, when the entire unpaid principal and interest were to be due.

Also on July 21, 1992, plaintiffs executed a promissory note in the principal amount of $135,000 payable to the present defendant, Short-Hagy, a Virginia limited partnership. The note provided for interest at the rate of 7.5% per year from the date of the note until July 21, 1994, and was payable during that period in equal interest-only payments of $843.75 per month beginning July 21, 1992,[1] and on the 21st day of each month thereafter until

---

[1] The first payment due date of July 21, 1992, is probably a typographical error since that is the date the note was executed. In any event, there was no evidence that the July 21, 1992, payment was ever an issue between the parties and the court mentions it only because an amortization schedule to be discussed later shows that plaintiffs did not make their first payment until August 1992.

July 21, 1994, at which time the rate of interest increased to 8% per year with principal and interest payments in equal monthly installments of $1,129.20 being due on August 21, 1994, and on the 21st day of each month thereafter until July 21, 2004, when the entire unpaid principal and interest were to be due. The second note also contained the following provision:

> Notwithstanding anything herein to the contrary, during such time that James Stallings ("Stallings") is not in default under the terms of a Promissory Note dated July 21, 1992, made by Stallings and payable to the Maker in the original principal sum of One Hundred Thirty-Five Thousand Dollars ($135,000),[2] the Note shall accrue interest at the rate of Nine percent (9.00%) per annum and be payable in equal monthly interest only payments of One Thousand Twelve and 50/100 Dollars ($1,012.50) until July 21, 1994, and in equal monthly principal and interest payments of One Thousand Two Hundred Fourteen and 63/100 Dollars ($1,214.63) commencing on August 21, 1994, and continuing on the same day of each month thereafter until July 21, 2004, at which time the entire unpaid principal and accrued interest shall be due and payable.

In other words, as long as the Stallings note was not in default, the interest rate on both notes was 9% per year. When the Stallings note was in default, plaintiffs' note carried interest at the rate of 7.5% or 8% per year, depending on whether the default occurred before or after July 21, 1994. Interest on the Stallings note remained at 9% per year. Under the terms of a security agreement between plaintiffs and defendant, which was also executed on July 21, 1992, the Stallings note was assigned to defendant. Stallings' payments, however, were to be made to plaintiffs. Both notes allowed prepayment "in whole or in part at any time without penalty."

James Stallings made 91 installment payments on his note. Thirteen of his payments were made by the 21st day of the month in which they were due. Seventy-eight payments were made after the 21st day of the month in which they were due.[3] Many of the payments that were not made by the 21st of the month were made within a few days after the 21st. For example, the October

---

[2]  Although the first note was signed by James and Margaret Stallings, it is clear from the evidence that James Stallings was the "real" maker of that note.

[3]  Plaintiffs' Exhibit 5 indicates that only 12 of Stallings' payments were made "on time." One of the payments claimed by plaintiffs to have been late was the payment made on August 23, 1996. That payment, however, was not the payment due on August 21, 1996, but was the payment due on September 21, 1996. It was not late.

1992 payment was made on October 23. The March 1993 payment was made on March 26. The May 1993 payment was made on May 26. In fact, of the 78 payments not made by the 21st of the month in which they were due, 34 were made within 10 days after the 21st. On March 22, 2000, a certificate of satisfaction was filed showing payment in full of the Stallings note.

With regard to plaintiffs' note, from July 1992 until April 2000, plaintiffs made all of the payments called for as though the Stallings note was not in default. Although it is not clear whether plaintiffs made interest-only payments of $1,012.50 per month from July or August 1992 (*see* above) through July 1994 and principal and interest payments of $1,214.63 per month thereafter or principal and interest payments of $1,214.63 for the entire period, which were the monthly payments called for if the Stallings note was not in default, it is clear that plaintiffs never made interest-only monthly payments of $843.75 or principal and interest payments of $1,129.20, which were the amounts called for if the Stallings note was in default.[4] In other words, from July or August 1992 through April 2000, plaintiffs paid their note as though the 9% interest rate applied, not as though the 7.5% or 8% interest rate applied. By letter dated May 5, 2000, however, plaintiffs forwarded to defendant a cashier's check in the amount of $95,078.77 which, according to plaintiffs, was the amount needed to pay off their note if the Stallings note was in default when each of the 79 (*but see* above) "late" payments was made, that is, if the 7.5% and 8% interest rates applied. Defendant took the position that plaintiffs' note carried interest at 9% for the entire period and rejected plaintiffs' attempted payoff. Plaintiffs then filed this suit seeking to have their note marked "satisfied" upon payment by them of the amount they claim they owe.

The first question, of course, is whether a default of the Stallings note occurred each time he failed to make a payment by the 21st of the month. If it did, plaintiffs argue that they were entitled to make payment on their note at the 7.5% or 8% interest rate set out in their note to defendant. If not, the 9% rate applied. While the court holds that each late payment did constitute a default, the court also holds that plaintiffs are now estopped from paying their note at the lower rates.

In interpreting contracts, "words used by the parties are to be given their usual, ordinary, and popular meaning, unless it can be clearly shown in some

---

[4] Plaintiffs' Exhibit 6 includes an amortization schedule that indicates that all of plaintiffs' payments were in the amount of $1,214.63, even those payments made during the period when the note merely called for interest-only payments. The court does not know if that amortization schedule is correct.

legitimate way that they were used in some other sense, and the burden of showing this is always upon the party alleging it." *Ames v. American National Bank,* 163 Va. 1, 39, 176 S.E. 204 (1934). *See also Clevert v. Jeff W. Soden, Inc.,* 241 Va. 108, 110-11, 400 S.E.2d 181 (1991); *Winn v. Aleda Const. Co.,* 227 Va. 304, 307, 315 S.E.2d 193 (1984). *Webster's* defines "default" as a "failure to do something required by duty or law." *Webster's Ninth New Collegiate Dictionary,* at 332 (1983). Under the first note at issue here, Stallings had a duty to make his payments by the 21st of each month. If he failed to do that, he was in default. The fact that the note did not impose a late charge until 10 days after an installment was due, or that Virginia law does not allow a late charge any sooner than seven days after an installment is due,[5] does not change that fact. Indeed, the note itself provided that the provision allowing a late charge ten days after a due date "shall not be construed to extend the due date for any amount required to be paid hereunder." Stallings' payments were due on the 21st. While the note and Virginia law restricted the actions plaintiffs could take as a result of a default, they did not negate the default itself. This does not mean, however, that plaintiffs argument based on Stallings' defaults is correct. In fact, it is not.

It is plaintiffs' position that the cashiers' check tendered to defendant in May 2000 was in an amount sufficient to pay off their note. That would be true, however, only if plaintiffs are correct that 79 (*but see* above) of their payments were made while Stallings was in default and therefore exceeded the amounts called for in their note. What plaintiffs' argument fails to take into account is that all defaults are not permanent.

Plaintiffs' note provides that the 9% interest rate applies "during such time that James Stallings ('Stallings') is not in default" under his note. It is only when Stallings *is* in default that the lower rates apply. Plaintiffs' note also does not provide that once a default occurs, the lower rates apply forever. They only apply while the default exists. And defaults do not necessarily exist forever. They can be cured.

> [T]he prevailing rule is to the effect that a tender of arrears due on a mortgage containing an acceleration clause, made before the holder of the mortgage has exercised his option to declare the entire amount of the debt due, prevents the exercise of such option. This is true whether the default was in relation to principal, interest, or taxes. The basis of this rule is said to be that *after a tender there is no longer any default which is the foundation of the right to exercise the option.*

---

[5] Va. Code § 6.1-330.80.

*Florance v. Friedlander*, 209 Va. 520, 523, 165 S.E.2d 388 (1969) (*quoting* 36 Am. Jur., *Mortgages*, § 400, at 887-88) (emphasis added).

In this case, all of Stallings' defaults were eventually cured. For example, when Stallings failed to make a payment by October 21, 1992, he was in default. When plaintiffs accepted his payment on October 23, however, the default was cured. It no longer existed. Thus, when plaintiffs' next payment was due on *their* note, such next payment being due on November 21, 1992, they were not entitled to make the lower payment that was applicable only when Stallings was in default. At most, they would be entitled to the lower interest rate for October 22 and October 23. Even that entitlement, however, depends on how the note is interpreted.

When a contract is clear and unambiguous, there is no need for the court to interpret it. The words of the parties control. *Lansdowne Devel. Co. v. Xerox Realty*, 257 Va. 392, 400-01, 514 S.E.2d 157 (1999); *Burns v. Eby & Walker, Inc.*, 226 Va. 218, 221, 308 S.E.2d 114 (1983). But where a contract is ambiguous, vague, or indefinite, judicial interpretation is appropriate. *Main-Atlantic v. DuPont & Co.*, 213 Va. 180, 184, 191 S.E.2d 211 (1972); *Shockey v. Westcott*, 189 Va. 381, 390, 53 S.E.2d 17 (1949). Plaintiffs' note is ambiguous.

Plaintiffs' note provides that "during such time that" Stallings was not in default, plaintiffs' note accrued interest at the rate of 9% per year. Such interest was payable through July 21, 1992, in monthly interest-only installments of $1,012.50. If Stallings was in default, plaintiffs' note accrued interest through July 21, 1992, at 7.5% per year, and was payable in monthly interest-only installments of $843.75. In either case, the monthly payment called for by the note was the exact amount of interest for one month; that is, $135,000 (amount of note) x 9% (interest rate)/12 (months) = $1,012.50. $135,000 x 7.5%/12 = $843.75. Those amounts are fine as long as Stallings was not in default for an entire month, in which case the $1,012.50 payment applied, or was in default for an entire month, in which case the $843.50 payment applied. The problem is that most of Stallings' defaults were not for an entire month. In those instances, the note's language that the 9% rate applied "during such time that" Stallings was not in default would seem to require the parties to calculate interest on a daily basis to determine how much interest accrued between each installment and in what amount plaintiffs' next interest-only payment would be. Again using the October 1992 payment as an example, Stallings' payment was due on October 21 but was not made until October 23. For the period October 21, 1992, through November 20, 1992, Stallings was in default for two days, October 22 and October 23. Interest on $135,000 at 7.5% per year for those two days is $54.44 ($135,000 (amount of

note) x 7.5% (interest rate)/12 (months)/31 (days from October 21 through November 20) x 2 (days)). Interest at 9% for the remaining 29 days is $947.18 ($135,000 x 9%/12/31 x 29). The total payment due on plaintiffs' note on November 21 would be $1,001.62. The note, however, provides for only two payment amounts through July 21, 1994, $843.75 and $1,012.50. No provision is made for a modified interest-only payment.

In addition, since both notes contain the same installment due dates, it was virtually impossible to determine whether Stallings was in default when plaintiffs' payment was due unless he had already made his payment or had not made a payment for the previous month. For example, on October 21, 1992, when plaintiffs' payment on their note was due, the parties could not know whether Stallings would also make his October payment that day, unless, of course, plaintiffs' payment was not made until one second before midnight, clearly an unlikely event. Thus, the parties could not know which interest rate applied to plaintiffs' note until after payment on that note was due. That can hardly be what the parties intended and, in the court's view, is a further ambiguity. Although these ambiguities exist, they do not need to be resolved. Whatever interpretation is placed on the note, plaintiffs are estopped from claiming any rate lower than 9%.

*T. v. T.*, 216 Va. 867, 224 S.E.2d 148 (1976), involved a dispute between a husband and wife about whether the husband had agreed, before the parties were married, to support the wife's child. The Supreme Court held that he had and that such agreement was an express oral contract between the parties. The husband then argued that the statute of frauds was a bar to the contract's enforcement.[6] The Court held that he was estopped from relying on the statute:

> To establish equitable estoppel, it is not necessary to show actual fraud, but only that the person to be estopped has misled another to his prejudice, *Security Co. v. Juliano, Inc.*, 203 Va. 827, 834, 127 S.E.2d 348, 352 (1962), or that the innocent party acted in reliance upon the conduct or misstatement by the person to be estopped. *Khoury v. Memorial Hosp.*, 203 Va. 236, 243, 123 S.E.2d 533, 538 (1962). Elements necessary to establish equitable estoppel, absent a showing of fraud and deception, are a representation, reliance, a

---

[6] The statute of frauds, Va. Code § 11-2, provides in pertinent part: "Unless a promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, is in writing and signed by the party to be charged or his agent, no action shall be brought in any of the following cases. . . . 5. Upon any agreement made upon consideration of marriage. . . ."

change of position, and detriment. *United States v. Fidelity and Casualty Co. of New York*, 402 F.2d 893, 898 (4th Cir. 1968).

We believe that the husband's promises to the wife, in reliance upon which she changed her position, acted to her detriment, and substantially performed her obligations until her husband made further performance impossible, have estopped him from pleading the statute of frauds.

216 Va. at 872-73. *See also Waynesboro Village v. BMC Properties*, 255 Va. 75, 82, 496 S.E.2d 64 (1998).

Each of the elements set out above is present here. With regard to the first element, *T. v. T.* recognized that a misrepresentation can be by "conduct or misstatement," the law being that a representation may be by "statements, conduct, action, behavior, concealment, or even silence." *County Sch. Bd. v. First Nat. Bk.*, 161 Va. 127, 137-38, 170 S.E. 625 (1933); *Khoury v. Memorial Hosp.*, 203 Va. 236, 243, 123 S.E.2d 533 (1962). In the case at bar, plaintiffs made 93 or 94 payments to defendant, depending on whether a payment was made on July 21, 1992 (*see* above), before tendering the cashier's check in May 2000. Each of those payments was in an amount that would indicate to anyone reading the note that Stallings was not in default. While plaintiffs' note allowed prepayment "in whole or in part at any time without penalty," payments of $1,214.63 or $1,012.50 (*see* above) are not the kind of "round-figure" extra payments plaintiffs would be expected to make to pay off their note early. They are the specific amounts — down to the penny — that plaintiffs were required to make if Stallings was not in default. By making those payments to defendant each and every month from July or August 1992 until May 2000, and by never telling defendant that Stallings was in default, even though the Stallings note had been assigned to defendant, plaintiffs unquestionably represented to defendant, by their "conduct, actions, behavior . . . [and] silence," that Stallings was never in default. Thus, the first element necessary to establish equitable estoppel is present.

The second element necessary to establish equitable estoppel is reliance. Such reliance in this case is obvious. Plaintiffs' note and Stallings note are in the same amount, $135,000. They were executed on the same day. As long as Stallings was not in default on his note, the interest rate of both notes was the same. After a two-year period during which plaintiffs made interest-only payments on their note, and again as long as Stallings was not in default, the monthly payments were the same. Under the security agreement entered into by plaintiff and defendant on the same day both notes were signed, defendant became the holder of both notes. It is clear that it was the intent of the parties

that Stallings' payments to plaintiffs on his note would simply "pass through" plaintiffs and be paid to defendant on their note. With the exception of the interest-only payments of the first two years, only when Stallings was in default would plaintiffs get a "break" and be required to pay to defendant less than Stallings was required to pay to them. By accepting plaintiffs' payments that were ostensibly being made at the 9% rate called for in their note, defendant relied on plaintiffs' representation that Stallings was not in default and that it, the defendant, was receiving the highest interest rate allowed by plaintiffs' note.

Plaintiffs' misrepresentation also caused defendant to change its position. Since Stallings note was assigned to defendant on July 21, 1992, defendant had a right to demand that Stallings comply with its terms. If defendant had known that Stallings was repeatedly in default and that plaintiffs would later take the position that such defaults entitled them to a lower interest rate even though they were continuing to make their payments as though the higher rate applied, defendant had every right to contact Stallings and demand that he make all future payments on time. By acting as though Stallings was not in default, plaintiffs deprived defendant of that opportunity. Thus, defendant changed its position from demanding Stalling's compliance with the note to acquiescing in plaintiffs' representation that Stallings was in compliance.

Lastly, defendant's reliance and change of position based on plaintiffs' misrepresentation will, if plaintiffs are successful in this action, be to defendant's detriment. Since the Stallings note has now been paid in full and since 93 or 94 of plaintiffs' payments under their note have already been accepted by defendant, if the court were to rule in favor of plaintiffs, it is now too late for defendant to demand timely payments from Stallings so that defendant might receive the higher rate of interest that it would have received had timely payments been made. Because of such detriment, and because each of the other elements set out in the cases is present, plaintiffs are estopped from claiming a right to pay their note at any rate lower than 9% per year. Their request to have their note marked "satisfied" is denied.